The BABCOCK & WILCOX
COMPANY, Plaintiff,

v.

ARKWRIGHT–BOSTON MANUFACTURING MUTUAL INSURANCE COMPANY, et al., Defendant.

No. 91–CV–987.

United States District Court,
N.D. Ohio,
Eastern Division.

Aug. 3, 1992.

574

Matthew J. Hatchadorian, Stephen J. Petras, Jr., Vorys, Sater, Seymour & Pease, Cleveland, OH, Duke W. Thomas, Vorys, Sater, Seymour & Pease, Columbus, OH, for plaintiff.

William H. Baughman, Jr., Weston, Hurd, Fallon, Paisley & Howley, Cleveland, OH, Robert D. Archibald, Charles H. Bragg, McNeal, Schick, Archibald & Biro, Cleveland, OH, Thomas E. Betz, Ernest W. Auciello, Jr., Gallagher, Sharp, Fulton & Norman, Cleveland, OH, Richard M. Shusterman, White & Williams, Philadelphia, PA, A. Thomas Kajander, Sharpe & Kajander, Houston, TX, for Arkwright–Boston Mfg. Mut. Ins. Co.

William H. Baughman, Jr., Ronald A. Rispo, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, OH, Robert D. Archibald, Charles H. Bragg, McNeal, Schick, Archibald & Biro, Cleveland, OH, Thomas E. Betz, Ernest W. Auciello, Jr., Gallagher, Sharp, Fulton & Norman, Cleveland, OH, Richard M. Shusterman, White & Williams, Philadelphia, PA, Robert E. Salmon, Stacy A. Broman, Meagher & Geer, Minneapolis, MN, for St. Paul Mercury Ins. Co.

Ralph D. McBride, Lisa G. Zummo, Bracewell & Patterson, Houston, TX, Richard E. Guster, Thompson, Hine & Flory, Akron, OH, Gardner Thornton, Citadel Ins. Co., Houston, TX, for Citadel Ins. Co.

Alan S. Kopit, Arthur M. Kaufman, Mark E. Staib, Hahn, Loeser & Parks, Cleveland, OH, for Travelers Indem. Co.

Robert D. Archibald, McNeal, Schick, Archibald & Biro, Cleveland, OH, A. Thomas Kajander, Sharpe & Kajander, Houston, TX, for American Intern. Marine Agency.

William H. Baughman, Jr., Weston, Hurd, Fallon, Paisley & Howley, Cleveland, OH, Robert D. Archibald, Charles H. Bragg, McNeal, Schick, Archibald & Biro, Cleveland, OH, Thomas E. Betz, Ernest W. Auciello, Jr., Gallagher, Sharp, Fulton & Norman, Cleveland, OH, Richard M. Shusterman, E. Douglas Sederholm, Barbara S. Zellner, White & Williams, Philadelphia, PA, Robert E. Salmon, Meagher & Geer, Minneapolis,

MN, A. Thomas Kajander, Sharpe & Kajander, Houston, TX, for Allianz Ins. Co.

Thomas E. Betz, Ernest W. Auciello, Jr., Gallagher, Sharp, Fulton & Norman, Cleveland, OH, Richard M. Shusterman, E. Douglas Sederholm, Barbara S. Zellner, John F. Glowacki, White & Williams, Philadelphia, PA, for Ins. Co. of North America.

Nicholas J. Milanich, Reminger & Reminger, Cleveland, OH, Thomas J. Quinn, William J. Cleary, Mendes & Mount, New York City, for Underwriters at Lloyd's London, English & American Ins., C.A. Parr, Caryl Vaughn Gibbs, Indemnity Marine Assurance Co.

Paul A. Rose, Deborah K. Urban, Sheila E. Noonan, Brouse & McDowell, Akron, OH, C. Gordon Starling, Jr., Gerard T. Gelpi, Gelpi, Sullivan, Carroll & Gibbens, New Orleans, LA, for Creole Ins. Co., Ltd.

Robert D. Archibald, McNeal, Schick, Archibald & Biro, Cleveland, OH, William F. Scully, Reminger & Reminger, Cleveland, OH, A. Thomas Kajander, Sharpe & Kajander, Houston, TX, for American Home Assurance Co.

Thomas E. Betz, Ernest W. Auciello, Jr., Gallagher, Sharp, Fulton & Norman, Cleveland, OH, Nicholas J. Milanich, Reminger & Reminger, Cleveland, OH, Dermot S. McGlinchey, James M. Garner, Martha M. Young, McGlinchey, Stafford & Lang, New Orleans, LA, E. Douglas Sederholm, Barbara S. Zellner, Linda S. Harowitz, White & Williams, Philadelphia, PA, for Ins. Co. of North America (UK) Ltd.

William J. Kraus, Kraus & Kraus, Cleveland, OH, Rockne L. Moseley, Janet M. Ahern, Moseley & Associates, New Orleans, LA, for McDermott, Inc.

## ORDER

SAM H. BELL, District Judge.

Presently before the court in the above-captioned cause is a motion in limine by plaintiff, The Babcock & Wilcox Company (B & W), for a determination of which state law, in the absence of a choice of law by the parties, is to be applied in construing a disputed term of B & W's liability insurance contract with defendant insurers. Plaintiff contends that, under the "more significant relationship" analysis adopted by Ohio courts, Ohio law should be applied. Defendants have filed a brief in opposition in which they contend that, under the same analysis, Louisiana law should be applied.

*BACKGROUND*

The present action involves a dispute over liability insurance coverage for asbestos-related claims arising from B & W's design, manufacture, sale, and service of boilers. Sales of the B & W boilers relevant to the present litigation were made on a nationwide and worldwide scale. Claims against B & W for exposure to asbestos during the relevant time period of 1979–80 were likewise filed throughout the United States and the world.

B & W is a corporation organized under the laws of Delaware. While at the time of contracting certain of its corporate offices had been relocated from New York to Louisiana, B & W's principal place of business was and remains Ohio, where the majority of its management, manufacture, and design operations are conducted, where the major portion of its employees reside, and where the bulk of its assets are located.

None of the defendant insurers has its place of incorporation or its principal place of business in either Louisiana or Ohio. Most of the defendant insurers, however, have obtained certificates of compliance with the insurance laws of Ohio and are licensed to conduct insurance business in the state.

In 1978, B & W became a subsidiary of J. Ray McDermott & Company (McDermott), a Louisiana-based corporation. While its nominal headquarters became located in Louisiana, B & W retained its separate corporate identity, and continued its major operations in Ohio. The responsibility for securing B & W's 1979–80 liability insurance coverage shifted to McDermott. Through its authorized Texas-based insurance broker, Adams & Porter Associates Inc., McDermott secured a multiple-layer comprehensive liability insurance policy for 1979–80 with defendant insurers on behalf of all its subsidiaries. However, specific and separate terms of coverage for B & W were individually considered and provided for in the otherwise gener-

al insurance contract. The contract did not include any choice of law provision.

Subject to McDermott's approval, Adams & Porter negotiated the terms of the insurance contract with defendant insurers. Negotiations took place primarily in Texas, New York, and England. The defendant insurers ultimately executed the insurance policy at their respective offices, none of which was located in Louisiana or Ohio. The executed policy was assembled by Adams & Porter at its Texas office and delivered to McDermott at its New Orleans, Louisiana, office. Premiums on the policy were paid out of McDermott's office to Adams & Porter in Texas, which then distributed the proportionate shares of the premiums to the defendant insurers at their respective offices.

While B & W's parent corporation, through its authorized agent, obtained this secondary excess liability insurance coverage for B & W in the amount of 17.5 million dollars, B & W retained its own separate primary comprehensive general liability policy with Travelers Insurance Company in the amount of two million dollars, and a first layer of excess coverage with Creole Insurance Company Limited in the amount of $500,000. There is no dispute over the fact that the primary coverage with Travelers has been exhausted; B & W and Creole agree that the Creole first-layer excess coverage has likewise been exhausted and paid out in full. Defendants contend, however, that the first layer of excess coverage with Creole has not been exhausted, and that they are therefore not obligated to reimburse B & W for any claims paid.

The central point of dispute between the parties is the construction of the term "occurrence" as it is used in the secondary excess liability insurance contract with defendant insurers, and in the primary excess liability insurance contract between B & W and Creole. Although neither party offers any analysis of the respective constructions of this term under the laws of Ohio and Louisiana, the parties are in apparent agreement that the legal construction of this term would differ significantly depending upon which state's law is applied, and that the choice of the applicable law would be virtually dispositive of the respective rights of the parties under the contract.

The scope of coverage of the insurance contract with defendant insurers is as follows:

> Underwriters hereby agree, subject to the limitations, terms and conditions hereinafter mentioned, to pay on behalf of the Assured all sums which the Assured shall be obligated to pay by reason of their liability imposed upon the Assured by Federal, State, and Municipal or other qualified authority or in respect of such liabilities assumed by the Assured under contract or agreement, for "property damage" and "personal injuries", as defined herein resulting from an "occurrence" as defined herein.

The definition of the term "occurrence" is the same in both the contract with defendant insurers and the contract with Creole:

> The term "Occurrence", whenever used herein, shall mean any happening or series of happenings, arising out of or due to one event taking place during the term of this contract in respect to all the Assured's operations.

Generally, there are three varying approaches taken by courts in construing the term "occurrence" under such a liability insurance policy. See Annotation, *What Constitutes Single Accident or Occurrence Within Liability Policy Limiting Insurer's Liability to a Specified Amount per Accident or Occurrence,* 64 ALR4th 668 (1988). Of relevance herein are two of these approaches, which respectively look to either the cause or to the effect of injury to determine the number of occurrences for purposes of liability coverage.

B & W urges a construction of "occurrence" that defines it in terms of the underlying *cause* of the multiple asbestos-related injuries and resulting claims. Thus, as there was but one occurrence that caused the asbestos-related claims against B & W—the design and manufacture of asbestos-containing boilers—the total amount of money paid out in disposing of the numerous resulting claims is aggregated to determine whether the policy limits of the Creole primary excess

liability coverage have been exhausted, and the threshold of defendant insurers' secondary excess liability coverage has been reached. This approach to construing "occurrence" is taken by the vast majority of courts. *Id.; Michigan Chemical Corp. v. American Home Assurance Co.,* 728 F.2d 374, 379 (6th Cir.1984). For present purposes the court will presume, in the absence of any analysis of this issue by the parties, and in view of B & W's stance on the issue presently before the court, that Ohio law is in keeping with this majority approach.

Defendant insurers, on the other hand, espouse the minority view that "occurrence" is to be construed in terms of the ultimate *effect,* thus rendering each individual injury or claim a separate occurrence. Under this construction, defendant insurers' obligation to pay on any one of these claims is not triggered until liability for that claim exceeds the $500,000 policy limits of the Creole policy. Because the typical asbestos-related claim is allegedly disposed of for about $10,-000, this would mean that defendant insurers would not be obligated to pay on any of the claims. For the reasons stated above, the court will presume that Louisiana law supports defendant insurers' construction of "occurrence". The court would note, however, that Louisiana courts are apparently in conflict over which approach to take. See 64 ALR4th at 674, 680–81.

## CHOICE OF LAW PRINCIPLES

In a diversity action, the district court is obliged to apply the choice of law rules of the state in which it sits. *Klaxon v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 491, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Boyd v. LaMaster,* 927 F.2d 237 (6th Cir.1991). This court must therefore apply Ohio choice of law rules.

For the present action, the determinative Ohio choice of law rules are set forth in *Nationwide Mut. Ins. Co. v. Ferrin,* 21 Ohio St.3d 43, 487 N.E.2d 568 (1986), and *Gries Sports Enterprises, Inc. v. Modell,* 15 Ohio St.3d 284, 473 N.E.2d 807 (1984), cert. denied 473 U.S. 906, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985). Ohio choice of law rules mandate that the law of the state with the more significant relationship to the contract should govern disputes arising from it. *National Union Fire Ins. v. Watts,* 963 F.2d 148 (6th Cir.1992). To determine which state has the more significant relationship to the contract, Ohio law has adopted the test set forth in the Restatement (Second) of Conflict of Laws, Section 188. *Macurdy v. Sikov & Love, P.A.,* 894 F.2d 818, 822 (6th Cir.1990); *Ferrin, supra; Modell, supra.*

Section 188 states, in relevant part:

(2) In the absence of an effective choice of law by the parties, * * * the contacts to be taken into account in applying the principles of [Section] 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

The plain language of Restatement (Second) of Conflict of Laws Section 188, as adopted by Ohio case law, requires the court to consider the Section 188 factors in applying the general principles enunciated in Restatement (Second) of Conflict of Laws Section 6 to determine the law applicable to an issue. *Watts, supra.* Section 6 sets forth:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems;

(b) the relevant policies of the forum;

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;

(d) the protection of justified expectations;

(e) the basic policies underlying the particular field of law;

(f) certainty, predictability, and uniformity of result; and

(g) ease in the determination and application of the law to be applied.

As to the application of the above principles, the parties are not in dispute. The parties are in dispute, however, over whether under Ohio conflict of laws principles this court may apply the provisions of a related Restatement section, Section 193, and the comments thereto. Section 193 reads:

The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in [Section] 6 to the transaction and the parties, in which event the local law of the other state will be applied.

Comment *b* to Section 193 provides that "The location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law provided that the risk can be located, at least principally, in a single state." Where no principal location of the risk can be determined, Comment *a* to Section 193 requires that the governing law be determined by application of the general principles set forth in Section 188.

Comment *f* to Section 193 deals specifically with "multiple risk" insurance policies of the type at issue in the present case. Comment *f* states, in part:

*Multiple risk policies.* A special problem is presented by multiple risk policies which insure against risks located in several states. A single policy may, for example, insure dwelling houses located in states X, Y, and Z. These states may require that any fire insurance policy on buildings situated within their territory shall be in a special statutory form. If so, the single policy will usually incorporate the special statutory forms of the several states involved. Presumably, the courts would be inclined to treat such a case, at least with respect to most issues, as if it involved three policies, each insuring an individual risk. So, if the house located in state X were damaged by fire, it is thought that the court would determine the rights and obligations of the parties under the policy, at least with respect to most issues, in accordance with the local law of X. * * *

The principles governing the federal courts' determination of state law are summarized in *Grantham and Mann v. American Safety Products,* 831 F.2d 596, 608–609 (6th Cir.1987):

In diversity cases, the federal courts must apply state law "in accordance with the then controlling decision of the highest state court." * * * If the forum state's highest court has not addressed the issue, the federal court must ascertain from all available data, including the decisional law of the state's lower courts, restatements of law, law review commentaries, and decisions from other jurisdictions on the "majority" rule, what the state's highest court would decide if faced with the issue. * * * Nevertheless, although a decision by a lower state court is not controlling where the highest state court has not spoken, * * * the decision of "an intermediate appellate state court ... is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." * * * (Citations and emphases omitted).

## ANALYSIS

Plaintiff urges this court to find that Section 193, which emphasizes the principal location of the insured risk as the primary factor in determining the controlling law, would be adopted by Ohio courts if they were presented with the issue herein. Plaintiff further contends that, under Section 193, Ohio is the state with the more significant relationship with respect to the construction of the terms of the liability insurance contract because Ohio is the principal location of the insured

risk, i.e., the situs of the major portion of the operations and assets of Babcock & Wilcox.

Defendant insurers contest the assertion that Ohio is the principal location of the insured risk. Defendants contend that Section 193 cannot be applied in the present case because no Ohio court has as yet adopted it, and indications are that Ohio courts would not adopt it; alternatively, defendants contend that Section 193 is inapplicable to the present facts by its own terms. Ultimately, defendants argue that the application of the principles enumerated in Section 6 and Section 188 mandates a finding that Louisiana law is controlling, in that Louisiana was the principal place of contracting, and because the goals of uniformity and predictability will be best served by application of Louisiana law.

### Location of the Insured Risk

■ Our first inquiry is to determine whether or not Ohio is the principal location of the insured risk in the present case. If not, then the question of whether or not Ohio courts would adopt Section 193 would be rendered moot, as our analysis in that case would be confined to the application of the principles set forth in Section 6 and Section 188. See, e.g., *General Acc. Ins. Co. v. Insurance Co. of North America* (1990), 69 Ohio App.3d 52, 590 N.E.2d 33; *Compagnie des Bauxites v. Argonaut–Midwest Ins.*, 880 F.2d 685, 690 (3rd Cir.1989); *Sandefer Oil & Gas v. AIG Oil Rig of Texas, Inc.*, 846 F.2d 319, 324 (5th Cir.1988).

Plaintiff's theory is that the "insured risk" in the present contract is the risk of loss to the insured, i.e., the risk of depletion of the insured's assets as a result of liability for claims made against it. Under this view, since Ohio is the principal location of the insured's assets, Ohio is therefore the principal location of the insured risk.

Although B & W cites no cases where "insured risk" is expressly construed in this manner, it finds some support for this approach through extrapolation of the language and holdings in a handful of cases: *Republic–Franklin Ins. Co. v. Progressive Casualty Ins. Co.* (1976), 45 Ohio St.2d 93, 95, 341 N.E.2d 600 ("A liability insurance policy is written for the protection of the insured."); *Eagle–Picher Industries v. Liberty Mutual Ins. Co.*, 829 F.2d 227, 248 (1st Cir.1987) (Ohio law applied in insurance coverage dispute over asbestos-related claims because the question of whether an Ohio manufacturer "is entitled to reimbursement, and to what extent, for the many millions of dollars in claims paid as a result of injuries caused by its products is of major concern to the state in which the business is domiciled."); *Unigard Security Ins. Co. v. North River Ins. Co.*, 762 F.Supp. 566, 589 (S.D.N.Y.1991) ("In the mass tort context, the state where the insured is located has been held to be the state having the greatest interest in the application of its law concerning insurance coverage.").

Defendants contend, on the other hand, that the "insured risk" is the risk of claims being made against the insured. Since claims for asbestos-related injury have arisen against B & W nationwide and worldwide, and since the contract explicitly provides coverage for the insured regardless of the geographical location of the claim, there is no one state that can be regarded as the principal location of the insured risk. In support of this construction, defendants cite several cases, the chief ones being *General Acc. Ins. Co., supra; Compagnie des Bauxites, supra;* and *Sandefer Oil & Gas, supra.* As with the cases cited by plaintiff, none of these cases expressly construe "insured risk" in the manner proposed; at best, these cases implicitly presume without any analysis of the issue that the situs of the insured risk is determined by where the injury occurred and/or the claim was filed.

The equation of "insured risk" with claims made appears appropriate enough where one of the issues is the insurer's duty to defend against claims wherever they may arise. See, e.g., *General Acc. Ins. Co., supra.* However, such an approach has little value in the present case, where the contract expressly states that the insurers "shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Assured ...". Under the terms of the present contract, rather than an obligation to defend

against claims, the insurers have "the right and shall be given the opportunity" to involve themselves in the defense of claims that may affect their interests. In such event, their only obligation is to "cooperate" in the defense of claims against the insured.

The ultimate issue herein is whether the insured is entitled to coverage for claims that allegedly continue to be filed and for reimbursement of funds already expended in payment of claims against it, i.e., whether it is entitled to protection and restoration of its assets. In this context, and where there is no duty to defend, the fact that claims have been filed in numerous jurisdictions, and the fact that performance under the contract has no geographical limitations, are largely irrelevant.

Essentially, the only performance by the insurers that is called for by the contract is to pay, to the "Assured which sustains the loss", all sums for which that insured becomes liable as a result of the occurrences covered in the contract. Thus, the true subject matter of the contract is the protection of the assets of each individual insured. The risk insured against for B & W is not the risk of claims being made against B & W, but the risk of claims being paid for by B & W and the resulting depletion of its assets. Therefore, the principal location of the insured risk insofar as B & W is concerned is the principal location of that insured's assets—Ohio.

### Application of Section 193

■ Defendants assert that Section 193 should not be applied in the present case because the Supreme Court of Ohio has implicitly rejected application of Section 193 in *Ferrin, supra.* However, the court finds no support for this contention in that case. There is simply no basis for defendants' claim that the Supreme Court of Ohio "passed over the opportunity" to adopt Section 193 in *Ferrin* by virtue of its application therein of Section 188 to determining the governing law for a contract of liability insurance. There is no mention of Section 193 in that case, no indication that the parties ever raised the issue of its applicability, and not even so much as a hint that the court considered it in any way. As B & W aptly points

out, there would have been no need in *Ferrin* to consider the applicability of Section 193, as the same result would have been reached in that case through application of either Section 193 or Section 188.

Defendants further contend that no Ohio court has as yet applied or followed Section 193. This contention is also without merit. While the appellate court in *General Acc. Ins. Co., supra,* decided the choice of law issue under the principles of Section 188, it did so because of the particular facts of that case, i.e., there was no principal location of the insured risk. Although the court rejected the contention that Maryland law should be held to be controlling under Section 193, there was no objection to nor rejection of Section 193 in principle. Indeed, the court's language and analysis makes it clear that it actually *followed* Section 193 in determining the governing law in that case. After quoting extensively from Section 193 and Section 188, and then stating that it was "[a]pplying the foregoing", the court determined whether or not there was a principal location of the insured risk and, having found none, turned to an analysis under the more general principles of Section 188. The court's analysis was thus in accordance with the precepts of Section 193, Comment *a.*

Next, defendants argue that, even if Ohio courts would follow Section 193, it is inapplicable to the present case by its own terms. Defendants point out that Section 193 requires that there be 1) a principal location of the insured risk; 2) an understanding between the parties as to the principal location of the insured risk; and 3) no other state with a more significant relationship to the transaction and the parties under the principles stated in Section 6.

We have already determined that there is a principal location of the insured risk insofar as B & W is concerned, and that is Ohio. The question of whether Louisiana has a more significant relationship to the transaction and the parties with respect to the contested issue will be discussed more fully *infra;* for present purposes, however, we state our conclusion that Louisiana does not have the more significant relationship under the principles stated in Section 6.

As for the remaining factor, the understanding of the parties as to the principal location of the insured risk, defendants err in regarding this as requiring, in effect, a mutual understanding that is tantamount to an express agreement on the issue. Virtually identical language in Comment *c* to Section 193 and Comment *e* to Section 188 shows that the understanding spoken of is to be loosely construed: "... it can often be assumed that the parties, to the extent that they thought about the matter at all, would expect that the local law of the state where the risk is to be principally located would be applied to determine many of the issues arising under the contract." Restatement (Second) of Conflict of Laws, Section 193, Comment *c*.

Defendants also take issue with Comment *f* to Section 193, regarding multiple risk policies. Defendants claim that the "divide the risks" approach to such policies of Comment *f*, which suggests that the law of the principal location of each individual insured risk should control in the determination of insurance disputes regarding that risk, would violate the principles of Section 6 regarding consideration for certainty, predictability, and uniformity of result, and the justified expectations of the parties in that regard. A similar viewpoint is expressed in dicta in *Westinghouse Electric Corp. v. Liberty Mutual Ins. Co.*, 233 N.J.Super. 463, 559 A.2d 435 (A.D. 1989), upon which defendants primarily rely:

> * * * [W]hen comprehensive nationwide coverage is purchased, it is surely the expectation of both insured and insurer that what the insurer has bought and what the insurer has sold is a single protection from liability irrespective of the particular state law under which that liability is determined so long as the risk, whether or not ultimately resulting in liability, is within the policy coverage. * * * In our view, the notion that the insured's rights under a single policy vary from state to state depending on the state in which the claim invoking the coverage arose contradicts not only the reasonable expectations of the parties but also the common understanding of the commercial community. It also seems to us anomalous, in conflict of law terms, to suggest that more than one body

of law will apply to a single contract. The theme running through the federal megacoverage cases is the assumption not only that state law will determine whose insurance law will govern the coverage dispute but also that it will be a single state's law chosen in accordance with applicable conflict principles of the forum. * * *

*Id.*, 559 A.2d at 442. Defendants cite a handful of federal district court cases that have cited this language from *Westinghouse* in reaching similar conclusions. See *Potomac Electric Power Co. v. California Union Ins. Co.*, 777 F.Supp. 968 (D.D.C.1991); *National Starch and Chemical Corp. v. Great American Ins. Co.*, 743 F.Supp. 318 (D.N.J.1990); *CPC International, Inc. v. Northbrook Excess & Surplus Ins. Co.*, 739 F.Supp. 710 (D.R.I.1990).

The relevance of these cases to the present action is questionable, in that B & W is not advocating the application of the laws of numerous states depending on where the claims arose, which is at the heart of the controversy in these cases. Rather, B & W's argument is consistent with their rulings in its emphasis on the application of the law of a single state, and in its assertion that the law of the insured's principal place of business, i.e., the principal location of the insured risk, be applied.

Furthermore, defendants' reliance on *Westinghouse* in support of this argument is also questionable, as the same appellate court that decided *Westinghouse* later criticized and rejected its reasoning. See *Johnson Matthey Inc. v. Pennsylvania Manufacturers' Assoc. Ins. Co.*, 250 N.J.Super. 51, 593 A.2d 367 (A.D.1991); *Gilbert Spruance Co. v. Pennsylvania Manufacturers' Assoc. Ins. Co.*, 254 N.J.Super. 43, 603 A.2d 61 (A.D. 1992). As stated by the court:

> In *Johnson Matthey*, we explained our disagreement with *Westinghouse*. In short, we concluded that nationwide uniformity of policy interpretation was an illusory goal, not truly achievable or necessarily preferable. If it is associated with the place of contract, it is associated with an arbitrary and usually irrelevant choice which [section] 193 of the *Restatement* discards.

Site-specific uniformity, on the other hand, is achievable, and represents a choice of the law of the jurisdiction that is most concerned with the outcome.

*Gilbert Spruance, supra,* 603 A.2d at 64. The court went on to make the following observation, which is most pertinent to the present claim of concern for certainty, predictability, and uniformity of result:

> If the parties to an insurance contract truly prize uniform interpretation of multistate insurance policy language, they can frequently achieve it by expressing a choice of law in the contract. * * * Their failure to express such a choice tends to show that uniform interpretation was not a conscious goal of the contracting parties.

*Id.* at 64–65.

In any event, there is little danger of nonuniform interpretation of the contract through application of Comment *f* of Section 193 in the present case, as we have already rejected the contention that the place of the insured risk in the present case is wherever the claims arose. Comment *f* is useful and relevant for our present purposes insofar as it lends support for a separate consideration of B & W's insurance coverage apart from that of the parent corporation and the other subsidiaries. Such an approach is entirely consistent with—and all but expressly called for by—the terms of the contract itself, which throughout treats B & W separately and individually, while for the most part treating the remaining insureds collectively.

Defendants point out that in *Westinghouse,* et al, it is the law of the principal place of business of the corporate parent that is held to be controlling. To the extent that this is accurate, however, it appears to be the result of coincidence, reached through the requisite case-by-case weighing of all relevant factors, rather than the result of a determination as a matter of law that the law of the principal place of business of the corporate parent is controlling in a dispute between its corporate subsidiary and their common insurer. Under the present facts and circumstances, B & W is better regarded as the separate corporation that it is, and McDermott, its corporate parent, is better regarded merely as B & W's agent for purposes of procuring its individualized insurance policy.

The court finds plaintiff's analysis of the question of whether Ohio courts would adopt and follow Section 193 to be persuasive. There is no inherent conflict between Section 193 and Sections 6 and 188. Rather, under the scheme of the Restatement (Second), Sections 189 through 197 are essentially subsections of Section 188, and act as models for the application of the principles of Section 188 to particular types of contracts:

> * * * These contracts are given special attention because it is considered possible to state with respect to each that, in the absence of an effective choice of law by the parties, a particular contact plays an especially important role in the determination of the state of the applicable law. * * *

Introductory Note to Title B of Chapter Eight, Restatement (Second) of Conflict of Laws. Where Section 6 states general principles applicable to all issues of choice of law, and Section 188 states general principles applicable to choice of law issues regarding contracts, Sections 189–197 state specific principles applicable to particular types of contracts. Thus, these sections together form a continuous and harmonious scheme for the analysis of choice of law questions regarding contract disputes.

The court can find no justification for concluding that Ohio courts, having adopted Sections 6 and 188, would reject the application of their integrally related subsections if faced with factual situations where they would be applicable. The court therefore finds that Ohio courts would adopt and apply Section 193 under the facts of the present case.

### Analysis Under Sections 6 and 188

Even if Ohio courts would for some reason reject the application of Section 193 under the present facts, an analysis of these facts under Sections 6 and 188 yields the same result—that Ohio law should control the resolution of the present dispute.

Of the factors listed in Section 6, the most pertinent to the present inquiry are subsections (2)(b) and (c), which prescribe an examination and balancing of the relative policies

of the forum state and other interested states in the determination of the issue in dispute. Comment *f* to Section 6 states that "In general, it is fitting that the state whose interests are most deeply affected should have its local law applied." While Ohio's interests in the resolution of this dispute are substantial, Defendants fail to present any correspondingly significant interests on the part of Louisiana that would compel the application of its law.

As established earlier, subsections (2)(d) and (f), regarding the expectations of the parties and the uniformity of result, are of little weight in the present case.

Under subsection (2)(g), the court should take into consideration the ease in determination and application of the law to be applied. The court has not had the benefit of any analyses or arguments regarding the ultimate issue of the construction under Ohio and Louisiana law of the term "occurrence". A preliminary inquiry, however, indicates that neither state has as yet definitively ruled on this issue. Since the courts in Louisiana are apparently in conflict, see 64 ALR4th 668, the determination of Louisiana law on this issue poses some difficulties. We have found no Ohio cases that have directly addressed the present issue, although at least one Ohio appellate court has adopted the general principle that the term "occurrence" in a liability insurance contract should be construed broadly and liberally in favor of extending coverage to the insured. *Buckeye Union Ins. Co. v. Liberty Solvents and Chemicals Co.* (1984), 17 Ohio App.3d 127, 132, 477 N.E.2d 1227. Although this in itself is not conclusive of Ohio law on this issue, it is persuasive precedent. Thus, the factor of the ease of determination of the law to be applied tends to favor Ohio.

Turning to the more specific factors listed in Section 188, we find that these also favor application of Ohio law. Of greatest significance is subsection (d), the location of the subject matter of the contract. Comment *e* to Section 188 makes it clear that the "subject matter" of the contract is equated with the "insured risk", in accord with the principles of Section 193.

Subsection (e) lends further support to the conclusion that Ohio is the state with the more significant contacts. None of the defendant insurers has any significant contact with either Louisiana or Ohio in terms of domicile, residence, place of incorporation, or principal place of business, although most of the insurers are authorized to conduct insurance activities in both states. While B & W's place of incorporation is Delaware, and while it maintains a nominal residence in Louisiana, its domicile, principal residence, and principal place of business is in Ohio.

As used in the Restatement, "the place of contracting is the place where occurred the last act necessary, under the forum's rules of offer and acceptance, to give the contract binding effect ...". Comment *e* to Section 188, Restatement (Second) of Conflict of Laws. Assuming, as defendants suggest, that the ultimate delivery of the contract to McDermott in Louisiana was the last act necessary to make the contract binding, then Louisiana would be the place of contracting. However, Comment *e* to Section 188 places this factor in proper perspective:

Standing alone, the place of contracting is a relatively insignificant contact. To be sure, in the absence of an effective choice of law by the parties, issues involving the validity of a contract will, in perhaps the majority of situations, be determined in accordance with the local law of the state of contracting. In such situations, however, this state will be the state of the applicable law for reasons additional to the fact that it happens to be the place where occurred the last act necessary to give the contract binding effect. The place of contracting, in other words, rarely stands alone and, almost invariably, is but one of several contacts in the state. Usually, this state will be the state where the parties conducted the negotiations which preceded the making of the contract. Likewise, this state will often be the state of the parties' common domicil as well. By way of contrast, the place of contracting will have little significance, if any, when it is purely fortuitous and bears no relation to the parties and the contract, such as when a letter of acceptance is mailed in a railroad station in the course of an interstate trip.

While Ohio may still adhere in theory to the general principle that the law of the state where the contract is made governs interpretation of the contract, see *Ferrin, supra,* 21 Ohio St.3d at 44, 487 N.E.2d 568, the adoption of Section 188 dictates that this general principle is applicable only when no other significant factors outweigh the place of contracting. Such is not the case here.

In the present case, assuming that Louisiana is the place of contracting, this factor stands alone as the only significant contact with Louisiana. There is no common domicile between B & W and any of the defendants. Although some consultations regarding negotiations may have taken place between McDermott in Louisiana and Adams & Porter in Texas, negotiations were conducted primarily in states and fora other than Louisiana or Ohio. Comment *e* makes it clear that, under such circumstances, the place of negotiations is likewise of little significance:

> The place where the parties negotiate and agree on the terms of their contract is a significant contact. Such a state has an obvious interest in the conduct of the negotiations and the agreement reached. This contact is of less importance when there is no one single place of negotiation and agreement, as, for example, when the parties do not meet but rather conduct their negotiations from separate states by mail or telephone.

Lastly, the place of performance, subsection (c) to Section 188, is of no bearing in the present case. The only performance at issue herein is defendants' duty to pay B & W under the terms of the contract. In this day of computerized banking and electronic transfers, the place where payment is to be made or received is of little, if any, real significance.

In sum, an analysis of the present facts under Sections 6 and 188 leads to the conclusion that Ohio is the state with the more significant contacts, and that Ohio law should control the resolution of the present dispute.

### Constitutionality of Applying Ohio Law

Defendants' final objection to the application of Ohio law is that it would be unconstitutional, because Ohio allegedly has no "... significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 818, 105 S.Ct. 2965, 2978, 86 L.Ed.2d 628 (1985). Based on our analysis above, the court finds no merit in this contention.

### CONCLUSION

The court finds that Ohio is the state with the more significant contacts with the parties and issues raised in the present case, and that therefore Ohio law will be applied.

IT IS SO ORDERED.

### *ORDER*

On August 3, 1992, the court issued an order determining the law to be applied in interpreting the insurance contract at the heart of the above-captioned case. The court agreed with plaintiffs argument that Ohio law should govern. Defendants now ask this court to revisit this issue through a motion to reconsider. (Docket # 184.) Plaintiff filed a response and defendants replied thereto.

Motions to reconsider are rarely meritorious.

> The motion to reconsider would be appropriate where, for example, the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since the submission of the issue to the Court. *Such problems rarely arise and the motion to reconsider should be equally rare.*

*Above the Belt, Inc. v. Mel Bohannon Roofing, Inc.,* 99 F.R.D. 99, 101 (E.D.Va.1983) (emphasis added).

Defendants' motion does not raise sufficient grounds to merit reconsideration. The court examined a considerable amount of evidence in ruling on the original motion and has not been persuaded that the law has changed or that it misapprehended or misunderstood the defendants' arguments. Recon-

sideration is not merited. Defendants' motion is DENIED.

IT IS SO ORDERED.